**VENEZUELAN CONTAINER LINE C.A., Flota Venezolana De Mar, Rio Y Lago (Marlago) S.A. and Venezuelan Container Service, Plaintiffs,**

v.

**NAVITRAN CORPORATION, in personam, and the Freights of the M/V SANTA ROSA, M/V LISA HEEREN, M/V MERSON, and the M/V DIANA D, in rem, Defendants.**

**No. 91–2216–CIV.**

United States District Court, S.D. Florida.

Nov. 18, 1991.

William B. Milliken, Miami, Fla., for plaintiffs.

Charles G. De Leo, Miami, Fla., for defendants.

ORDER DENYING DEFENDANT'S MOTIONS TO QUASH WARRANT OF ARREST, AND ORDER DENYING MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes before the Court upon Defendant Navitran Corporation's

("Navitran") Motion to Quash Warrant of Arrest, and Motion to Dismiss for Lack of Subject Matter Jurisdiction. Plaintiffs, Venezuela Container Line C.A., Flota Venezolana De Mar, Rio y Lago (Marlago) and Venezuela Container Service (together, "VCS") have filed a Response, and Defendants have filed a Counterclaim. By Order dated November 5, 1991, this Court granted Defendant Navitran's Motion for Protective Orders as to certain depositions, until the instant substantive motion was decided. For the reasons which follow, this Court holds that it has jurisdiction over Plaintiffs' *in rem* action.

## I. FACTS

Plaintiffs are Venezuelan corporations engaged in the common carriage of cargo by water between points in North America and Venezuela. Pursuant to the terms of a November, 1988 General Agency Agreement ("Agreement"), Plaintiffs retained Defendant Navitran to serve as Plaintiffs' North American agent commencing in May, 1989. In July, 1991, Plaintiffs terminated the agency Agreement. According to the Verified Complaint, Defendant breached the agreement by failing to tender freights of certain of Plaintiffs' vessels collected by Navitran during its term of agency. The Complaint further alleges that Navitran failed to disburse certain funds provided by Plaintiffs for payment of operating expenses. On October 8, 1991, VCS caused the arrest of the freights amounting to $594,086.89, held by Navitran in a local bank account. Defendant has filed a counterclaim under diversity jurisdiction, alleging an entitlement to an amount fixed by the contract if Navitran's agency was terminated before the agreement's expiration in October of 1993.

## II. ANALYSIS

The sole issue for determination is whether the underlying General Agency Agreement is maritime in nature, so as to give rise to admiralty jurisdiction. This Court holds that the agreement is a maritime contract.

The Supreme Court has recently held in *Exxon Corp. v. Central Gulf Lines, Inc.*, — U.S. —, 111 S.Ct. 2071, 114 L.Ed.2d 649 (June 3, 1991) that "there is no *per se* exception of agency contracts from admiralty jurisdiction," thereby overruling its decision in *Minturn v. Maynard*, 58 U.S. (17 How.) 477, 15 L.Ed. 235 (1855). In *Exxon*, a unanimous Court found that Exxon's contract to supply fuel oil to a shipping company was maritime, even though Exxon served at times merely as an agent, arranging for a third party supplier to refuel ships in certain ports. Rather than exclude all agency contracts from admiralty jurisdiction, the Court directed lower courts to "look to the subject matter of the agency contract and determine whether the services performed under the contract are maritime in nature." *Id.* 111 S.Ct. at 2077.

Thus, the district court must analyze and interpret the subject matter of the contract and relationship between the parties in each particular agency situation, with a view toward protection of maritime commerce. *Id.* at 2076. This inquiry has long defied precise formulation. As Justice Harlan recognized, "[t]he boundaries of admiralty jurisdiction over contracts ... being conceptual rather than spatial, have always been difficult to draw. Precedent and usage are helpful insofar as they exclude or include certain common types of contract...." *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961).

Unfortunately, in the wake of *Exxon*, the prior caselaw provides no clear guidance on this subject. The result in this action would have been controlled by the Eleventh Circuit's holding in *E.S. Binnings, Inc., v. M/V Saudi Riyadh*, 815 F.2d 660 (11th Cir.1987), *reh'g denied, en banc*, 820 F.2d 1231. In that case, admiralty jurisdiction was found lacking where the agent provided four types of services to a liner's vessels: (1) cargo solicitation; (2) documentation services; (3) financial services; and (4) husbanding services. *Id.* at 664. The Court found that agency contracts do not give rise to admiralty jurisdiction, placing primary reliance upon the "preliminary contracts" doctrine. The court reasoned

that "[a]lthough contracts for performance of preliminary services relate to the business of the ship, they are essentially no different from services ordinarily performed by other shoreside persons who are not involved in the operation or navigation of the ship, and, therefore are not maritime in nature." *Id.* at 663. In *Exxon*, the Supreme Court specifically declined to rule on the validity of the preliminary contracts doctrine. 111 S.Ct. at 2077 n. 7.

■ The Supreme Court emphasized that its holding in *Exxon* is "a narrow one," removing only "the precedent of *Minturn* from the body of rules that have developed over what types of contract are maritime." *Id.* 111 S.Ct. at 2076–77. It is difficult, however, to disentangle *Minturn* from the Eleventh Circuit's analysis in *E.S. Binnings*. The panel did not reach its conclusion by considering the relationship between general agency agreements and the protection of maritime commerce. Rather, the Court considered itself bound by the "firmly established" *Minturn* rule that agency contracts are outside the admiralty jurisdiction. *See id.* at 665 n. 4. The court noted that the rule has been "condemned by commentators," but also noted that only the Supreme Court could overrule this precedent. Since the Supreme Court has recently taken this precise step, *E.S. Binnings* retains its vitality only to the extent that it holds that agency contracts for certain preliminary services are not maritime in nature. After *Exxon*, it is necessary to determine if each agency agreement is maritime in nature, even if the contract is for preliminary services.

■ Against this legal background, the Court concludes that the general agency contract in this case was maritime in nature. One commentator has set out criteria helpful to this determination:

> In general a contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment is subject to maritime law and the case is one of admiralty jurisdiction, whether the contract is to be performed on land or water....

A contract is not considered maritime merely because the services to be performed under the contract have reference to a ship or to its business, or because the ship is the object of such services or that it has reference to navigable waters. In order to be considered maritime, *there must be a direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry,* for the very basis of the constitutional grant of admiralty jurisdiction was to ensure a national uniformity of approach to world shipping.

1 *Benedict on Admiralty* § 182 (7th Ed. 1991).

Under this "test," the better view is that the general agency contact involved in this case is directly and substantially linked to the operation and management of ships. The agency here did not involve mere bookkeeping functions, such as the collection of freights. Navitran undertook to make *all* arrangements concerning VCS's ships while in port. Under the contract, Navitran was responsible for "arranging and/or attending to customs clearance and *all services pertaining to the vessel's movements; e.g. entering port, during stay and leaving port, and arranging for contracts for pilotage, towage, stevedoring, tallying and ancillary services.*" Agreement at ¶ II(d) (emphasis added). Further, Navitran had responsibility for "supervising operations and ensuring efficient dispatch of the vessel." *Id.* at ¶ II(e).

In addition, Navitran undertook complete representation of the VCS's services in North America. Navitran was to arrange advertising, press releases, and sailing cards. Navitran undertook all dealings with receivers and shippers, including "canvassing, quoting freight rates, booking and receiving cargo for shipment, arranging loading, discharging and checking, advising receivers and shippers of the vessel's position, delivering inward cargo, calling down outward cargo, attending to transhipment cargo, maintaining contact with shippers, consignees, forwarding agents, port and

other authorities and trade organizations, [and] doing its utmost to obtain cargo for the Owner's service." *Id.* at ¶ II(b). Under the agency contract, then, Navitran functioned much as a "branch office" of the foreign shipper. It would be an anomalous application of admiralty law to hold that certain otherwise maritime activities fall outside of this Court's jurisdiction solely because they were entrusted to a shoreside agent, rather than carried out by the liner as principal.[1] This Court concludes that this agency contract will support maritime jurisdiction.

Other Courts, though constrained by *Minturn,* have reached the same substantive conclusion. The Second Circuit has stated in dicta that, "[a] general agency relationship is intimately related with the shipping industry and would warrant inclusion within admiralty." *Peralta Shipping Corp. v. Smith & Johnson (Shipping) Corp.,* 739 F.2d 798, 804 (1984), *cert. denied,* 470 U.S. 1031, 105 S.Ct. 1405, 84 L.Ed.2d 791 (1985). The Ninth Circuit has upheld jurisdiction over an unpaid balance due on a agency contract for husbanding a vessel. *Hinkins Steamship Agency v. Freighters, Inc.,* 498 F.2d 411 (1974).

Commentators have also argued for the inclusion of certain agency contracts within the admiralty. *See* 7A J. Moore, *Moore's Federal Practice,* § .250, at 3006 ("Quite clearly, such agreements are an integral part of, and in furtherance of, maritime commerce and, consequently, should be cognizable within the admiralty jurisdiction of the district courts"); Gilmore & Black, *The Law of Admiralty,* § 1–10, 28 n. 94b (2d ed. 1975) (noting that a general agency agreement's purpose is "to effectuate the physical economic operation and employment of a vessel" and criticizing precedent excluding such contracts as "of dubious defensibility"); *Benedict on Admiralty, supra,* at § 183 (while preliminary contracts doctrine has worked "reasonably well," it has led some courts to exclude from admiralty contracts like general agency agreements, which are "intimately related to the shipping industry") (quoting dicta in *Peralta, supra*).

Thus, this Court concludes that jurisdiction over the instant general agency contract will serve the purposes of maritime jurisdiction—the promotion and protection of maritime commerce. Clearly, not all agency contracts would be so included in a district court's jurisdiction. Many agency contracts, like any other contracts relating to shipping, would involve matters too remote or tangential to be considered maritime in nature. However, in this case, the Court finds that Navitran's responsibilities under the General Agency Agreement are directly and substantially linked to the operation and management of VCS's ships.

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that Navitran's Motion to Quash Warrant of Arrest be, and the same hereby is, DENIED. It is further

ORDERED and ADJUDGED the parties may PROCEED with any discovery, including depositions, that has been stayed by Order of this Court pending resolution of subject matter jurisdiction.

DONE and ORDERED in chambers at the United States District Courthouse, Federal Courthouse Square, Miami, Florida, this 18th day of November, 1991.

1. The precise holding in *Exxon* is instructive in this regard. In that case, the Supreme Court noted that two actions arose out of Exxon's contract for provision of fuel oil. In the "New York claim," *Exxon* provided fuel directly to the ship, clearly a maritime activity. As to the "Jeddah claim," the transaction at issue in the case, Exxon functioned as an agent, purchasing fuel from a third party who then delivered the fuel to the ship. The Court held that, "[b]ecause the nature and subject-matter of the two trans-actions are the same as they relate to maritime commerce, if admiralty jurisdiction extends to one, it must extend to the other." *Exxon,* 111 S.Ct. at 2077.

Thus, the distinction between agent/principal and direct/indirect provision of services is much less important to the inquiry than the subject matter of the contract involved. If the contract itself is maritime in nature, the district court will have jurisdiction.